## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEAUGNTEY HUGHES and** | : | **CIVIL ACTION NO. 1:20-CV-2204** |
| **G.B., a minor,** | : | |
| | : | **(Judge Conner)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NICHOLAS HERBSTER and** | : | |
| **ABIGAIL ROBERTS,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This Section 1983 action arises out of plaintiff Keaugntey Hughes's arrest for disorderly conduct following a traffic stop for a window tint violation. Hughes asserts that Harrisburg Police Officer Nicholas Herbster used excessive force in violation of her civil rights when he pulled her out of her vehicle, slammed her to the ground, and handcuffed her. She also claims that Officer Abigail Roberts failed to intervene to prevent Officer Herbster from using excessive force, that both defendants are liable for intentional infliction of emotional distress, and that both are culpable under the state-created danger doctrine for their indifference to the needs of Hughes's five-year-old daughter, G.B. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons that follow, we will grant the motion in part and deny it in part.

## I. **Factual Background & Procedural History**[1]

On the evening of May 9, 2019, Hughes picked up G.B. from ballet class in

Penbrook Borough, Pennsylvania, buckled her into a car seat, and started driving

home to Mechanicsburg.  (See Doc. 94 ¶ 1; Hughes Dep. 41:17-44:19, 127:8-128:3).

Hughes was driving westbound through the intersection of North 6th and Maclay

Streets in Harrisburg when she noticed a police vehicle parked at a nearby gas

station; Officer Herbster was behind the wheel.  (See Hughes Dep. 45:10-21).

Officer Herbster saw the heavily tinted windows on Hughes's gold Acura, pulled

behind her, and turned on his emergency lights to initiate a traffic stop.  (See id. at

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. PA. L.R. 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Defendants filed a statement of material facts, (see Doc. 94), but Hughes did not file a response.  Instead, she sets forth a "counter-statement of facts" in her opposition brief.  (See Doc. 99 at 6-8).  Neither Federal Rule of Civil Procedure 56 nor Local Rule 56.1 authorizes this filing, and Hughes did not request leave of court to file it.  We thus decline to accord these passages the evidentiary weight contemplated by Rule 56.1.  See Barber v. Subway, 131 F. Supp. 3d 321, 322 n.1 (M.D. Pa. 2015) (Conner, C.J.); see also Rau v. Allstate Fire & Cas. Ins. Co., 793 F. App'x 84, 87 (3d Cir. 2019) (nonprecedential) (citing with approval, inter alia, Barber, 131 F. Supp. 3d at 322 n.1, in holding district courts enjoy wide discretion in interpreting their local rules).  Nonetheless, we have examined the entire Rule 56 record, including Hughes's counterstatement, in resolving the instant motion.
We also acknowledge that defendants "willingly accept [Hughes's] version of the facts as set out on pages 6-8 of her Response," except for the assertion that she was "fumbling for her other documents" after handing over her driver's license.  (See Doc. 102 at 1 (citing Doc. 99 at 6)).  The factual background herein derives from defendants' Rule 56.1 statement, the uncontested portions of Hughes's counter-statement supported by her deposition and that of Officer Roberts, (see Doc. 94-2, Hughes Dep.; Doc. 94-3, Roberts Dep.), and the dashcam footage of the traffic stop, (see Doc. 26, Ex. A, 5/9/19 Rec.).

43:15-17, 45:22-46:3).  He also radioed his location; Officer Roberts heard the radio

call and drove to the area to assist.  (See Roberts Dep. at 26:7-28:1).  The events that

followed were captured by the video camera affixed to Officer Herbster's

dashboard.  (See 5/9/19 Rec. 00:39-27:26).[2]

       Hughes made a lefthand turn onto North 5th Street and pulled over to the

curb approximately halfway down the block toward Peffer Street.  (See id. at 00:45-

01:13).  Officer Herbster parked directly behind Hughes.  (See id. at 01:11-01:17).

Hughes was talking on her cell phone when Officer Herbster approached her

vehicle.  (See Doc. 94 ¶ 11).  Hughes had been calling and FaceTiming family

members to tell them where she was and what was happening.  (See Doc. 94 ¶¶ 7-10;

see also Hughes Dep. at 52:13-54:24, 58:4-19, 108:11-109:9).  She recalled speaking

with her two sisters and a cousin.  (See Hughes Dep. at 53:2-9, 98:19-100:3, 105:8-

106:22, 109:10-110:5).  Officer Herbster explained he pulled Hughes over because of

the heavy tint on her windows.  (See id. at 51:19-52:3).  He then asked for her

license, registration, and proof of insurance.  (See id. at 52:5-6).  Hughes quickly

handed over her license, (see 5/9/19 Rec. 02:08-2:11), but she did not have her

vehicle paperwork at the ready; she was still on the phone with one of her sisters

while looking for her other documents, (see Hughes Dep. at 52:8-12, 59:2-3).  Officer

---

[2] Although we can see much of what transpired during the traffic stop, we are unable to hear anything because Harrisburg police vehicles supposedly did not have the ability to record audio at the time of Hughes's arrest and neither Officer Herbster nor Officer Roberts wore a microphone.  (See Roberts Dep. 41:19-42:2; see also Doc. 78 at 3 n.2).

Roberts arrived on the scene around this time.  (See 5/9/19 Rec. 03:30-03:35; Roberts Dep. at 28:5-17).

Officer Herbster instructed Hughes to get off the phone.  (See Hughes Dep. at 54:25-55:2)).  Hughes asked him why; she later explained that she wanted to stay in contact with her sister because Officer Herbster spoke to her "in an aggressive manner" and she was afraid of what might happen.  (See id. at 55:3-19, 110:20-112:9, 127:24-129:3).  Officer Herbster repeated his directive.  (See id. at 55:20-56:1). Hughes indicated that she would end the phone conversation in order to begin recording the traffic stop, which Officer Herbster purportedly dismissed as unnecessary because he was wearing a body camera.  (See id. at 57:4-59:15; 60:8-20; see also id. at 112:20-113:4).  He reiterated his demand to terminate the call and then told Hughes to get out of the car.  (See id. at 59:20-60:7, 61:18-20, 63:3-10, 113:4-10).[3] Hughes questioned the order but did not comply with it.  (See id. at 63:12-14, 64:8-15, 113:11-14).  Officer Herbster opened Hughes's door, reached across her body, disengaged her seatbelt, and started pulling her out.  (See id. at 65:21-66:7, 67:1-3,

---

[3] Officer Roberts remembered hearing Officer Herbster instruct Hughes to get off the phone "at least four times," but she could not recall how many times he warned Hughes he would remove her from the car if she did not comply.  (See Roberts Dep. at 32:21-33:22; see also id. at 43:10-44:11, 80:3-81:12 (explaining why Hughes was detained for officer safety)).  Hughes denies Officer Herbster gave any warning at all.  (See Hughes Dep. at 61:14-17).  There also is a factual discrepancy as to whether Hughes terminated the phone call and started recording; Hughes believes she did, (see id. at 60:21-23), but she also said she may have dropped her phone before she had a chance to hang up, (see id. at 63:18-64:7).  Officer Roberts recalled that Hughes just "started screaming her location, 5th and Pe[ff]er, over and over and over again," when Officer Herbster started pulling her from the car, (see Roberts Dep. at 36:13-15; see also id. at 29:21-30:9, 81:1-17), suggesting she may have still been on the phone with her sister when the encounter became physical.

68:10-70:9; 113:17-20; <u>see also</u> 5/9/19 Rec. 03:42-04:00).  Hughes dropped her phone

on the passenger side, yelled "get off me," and began holding onto whatever she

could to stay in the car.  (<u>See</u> Hughes Dep. at 63:18-22, 65:2-12, 67:4-25, 70:24-71:10,

113:22-25; <u>see also</u> Roberts Dep. at 39:1-19).  Officer Roberts stepped in at this point

to help Officer Herbster extricate Hughes from the vehicle by loosening Hughes's

grip on the driver door handle.  (<u>See</u> Hughes Dep. at 113:20-21; Roberts Dep. at

40:11-17, 45:18-23; <u>see also</u> 5/9/19 Rec. 04:00-04:07).  Officer Herbster appears to grab

Hughes by the back of the neck with his left hand while his right forearm crosses

beneath her chin.  (<u>See</u> 5/9/19 Rec. 04:00-04:07).  Hughes then falls to her knees.

(<u>See</u> <u>id.</u>)

     The officers scuffled with Hughes, who weighed approximately 119 pounds,

for approximately 45 seconds before dislodging her from the car and pinning her

down.  (<u>See</u> 5/9/19 Rec. 03:48-04:35; <u>see also</u> Hughes Dep. at 126:10-12).  Hughes

claims that, once she was out of the car, Officer Herbster "[p]icked [her] up and

slammed [her] into the ground." (<u>See</u> Hughes Dep. at 113:17-21; <u>see also</u> <u>id.</u> at 72:2-

8, 114:4-5).  As best we can tell from the video, Hughes's upper body rises off the

ground while Officer Herbster's grasps her from behind, they both fall forward, and

her face strikes the pavement at the same time his left leg rises several feet off the

ground.  (<u>See</u> 5/9/19 Rec. 04:15-04:33).  He also appears to lie or put much of his

weight on Hughes's back while Officer Roberts holds down her legs.  (See id.)[4]
Officer Herbster handcuffed Hughes moments later.  (See id. at 04:30-04:50).

G.B. unbuckled herself from her car seat during the scuffle, exited through
the open door, and ran over to her mother while she was being handcuffed.  (See id.
at 04:17-04:42; see also Hughes Dep. at 94:4-15).  Officer Roberts tapped G.B. on the
shoulder, shooing her away toward the sidewalk; neither officer attempted to secure
the stray child.  (See 5/9/19 Rec. 04:39-04:43).  Hughes ultimately asked a female
bystander she did not know to pick up G.B. because she was concerned for G.B.'s
safety around an older man who hovered nearby.  (See Hughes Dep. at 88:1-89:23,
92:8-93:2, 130:22-131:15; see also 5/9/19 Rec. 04:36-05:19).  Hughes's sister retrieved
G.B. from the scene before Hughes was taken away for booking.  (See Hughes Dep.
at 93:5-94:3, 94:24-95:15, 100:9-101:9, 139:13-140:4; see also 5/9/19 Rec. 17:13-18:00).
Hughes cut her knees when the officers took her to the ground, and she claims to
have suffered lingering aches and pains throughout her body, including her neck
and wrists, but she never sought medical attention for these injuries, nor did she
seek medical or psychological treatment for G.B.  (See Hughes Dep. at 69:11-14,
82:13-85:14, 86:14-20, 118:14-121:4, 133:20-134:7).

---

[4] Notwithstanding defendants' willingness to adopt the "version of the facts
as set out on pages 6-8 of [Hughes's] Response," (see Doc. 102 at 1), they plainly do
not concede that "Officer Herbster kneeled on Ms. Hughes' back as Officer Roberts
helped to hold Ms. Hughes down," (see Doc. 99 at 7; see also Doc. 95 at 19).  The
dashcam's view of this interaction is partially obstructed by Officer Roberts.  (See
5/9/19 Rec. 04:20-04:50).

The Commonwealth charged Hughes with disorderly conduct, improper window tinting, and resisting arrest; she pled guilty to disorderly conduct.  (<u>See</u> Doc. 94 ¶ 2 (citing Doc. 25-4 at 2); <u>see also</u> Hughes Dep. at 96:6-97:24).  Hughes filed a complaint against Officers Herbster and Roberts in November 2020.  We granted Hughes leave to file an amended complaint in March 2021 and a second amended complaint in May 2021, and she subsequently agreed to dismiss certain claims.  Defendants have moved for summary judgment on Hughes' remaining claims.  The motion is fully briefed and ripe for decision.

## II.   <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>See</u> <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non[]moving party and draw all reasonable inferences in that party's favor."  <u>Thomas v. Cumberland County</u>, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

574, 587-89 (1986). Only if this threshold is met may the cause of action proceed.

See Pappas, 331 F. Supp. 2d at 315.

## III. **Discussion**

Defendants contend they are entitled to qualified immunity with respect to plaintiffs' claims under 42 U.S.C. § 1983. (See Doc. 95 at 3-14). Defendants also dispute the sufficiency of the evidence supporting each claim, (see id. at 14-29), and the viability of plaintiffs' punitive-damages demand, (see id. at 29-30). We address these arguments *seriatim*.

### A. **Qualified Immunity**

Qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). No liability will attach if a reasonable actor could have believed the challenged conduct was in compliance with settled law. See id. The doctrine cloaks government officials with "immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted), and generally "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The burden to establish qualified immunity rests with the defendant claiming its protection. Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2011) (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989)). A court evaluating a claim of qualified immunity considers a two-pronged inquiry: whether, based on the facts, a constitutional right has been violated and, if so, whether the right was

"clearly established" at the time of the alleged violation.  See Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).

Officer Herbster argues Hughes has failed to overcome his invocation of qualified immunity in several respects.  He asserts that his actions were reasonable under the Fourth Amendment because Hughes "was not being readily compliant with [his] directives during the traffic stop," (see Doc. 95 at 5; see also id. at 12 (citing United States v. Mitchell, 454 F. App'x 39, 41 (3d Cir. 2011) (nonprecedential))); that he did not violate any clearly established law, (see id. at 7 (citing Carroll v. Carman, 574 U.S. 13, 16-17 (2014) (per curiam)); and that Hughes's guilty plea and conviction for disorderly conduct bars her Section 1983 claim under the rule of Heck v. Humphrey, 512 U.S. 477 (1994).  These arguments are unavailing under binding precedents.

Qualified immunity typically is a question of law, but when its applicability "depends on disputed issues of fact, those issues must be determined by the jury." See Montiero v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir. 2006) (citing Johnson v. Jones, 515 U.S. 304, 313 (1995)); Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002). There are several disputed issues of material fact in the record before us that preclude a finding of qualified immunity.  It is unclear whether Hughes ever vocalized her fears about exiting her vehicle in response to Officer Herbster's commands, (compare Doc. 94 ¶ 18, with Hughes Dep. at 63:3-10); whether she ended her phone call—thereby complying with Officer Herbster's directive—before being removed, (compare Doc. 94 ¶¶ 19-20, with Hughes Dep. at 60:10-61:13); whether she "continued to resist" after being pulled into the street, (compare Doc. 84 ¶ 32, and

9

Doc. 94 ¶¶ 28-29, with Hughes Dep. at 82:23-83:6); or whether Officer Herbster "dragged" her into the street, "slammed" her face into the ground, and "knelt" on her back, (compare Doc. 84 ¶¶ 28-29, with Hughes Dep. at 72:2-8, 113:17-21). The facts underlying the parties' competing accounts color the analysis of Officer Herbster's actions and whether they were reasonable under the circumstances. Summary judgment is inappropriate while those details remain in dispute.

Officer Herbster's dashcam footage does not resolve these conflicting accounts, notwithstanding defendants' reliance on that piece of evidence. For one thing, the footage lacks audio, and thus sheds no light upon any verbal exchanges between Hughes and Officer Herbster. For another, our view of the struggle is blocked intermittently by Officer Roberts' torso, so we cannot determine if Officer Herbster knelt on Hughes's back as the struggle unfolded. (See 5/9/19 Rec. 03:48-04:35). Likewise, the dashcam's vantage point does not allow for a view inside Hughes's car, meaning that any factual contentions about Hughes continuing to use her phone or "fumbling for her other documents," (see Doc. 102 at 1), remain unclear.

Setting aside the foregoing disputes, Officer Herbster simply is mistaken when he contends Hughes asserts a right that is not clearly established. The Third Circuit has recognized that the Fourth Amendment forbids law enforcement officers from using excessive force when making an arrest. See Couden v. Duffy, 446 F.3d 483, 496-97 (3d Cir. 2006) (citing Graham v. Connor, 490 U.S. 386, 395 (1989); Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004)). In determining the reasonableness of an officer's actions, courts consider the "severity

10

of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 397.

The case law Officer Herbster cites for the proposition that "the force he used was reasonable," or that he "would have been justified in using even greater force than he did," is distinguishable. (See Doc. 95 at 15 (citing Mitchell, 454 F. App'x at 40-41; Brown v. Cuscino, No. 08-CV-1224, 2011 WL 1085892 (W.D. Pa. Mar. 21, 2011)). In Mitchell, officers pulled the defendant out of the backseat of a vehicle after he refused to get out of his own accord. The vehicle had been surreptitiously traveling away from reports of gunshots at an unusually low speed and with its headlights off; the officers learned Mitchell had a history of weapons offenses when they queried his name for warrants. See Mitchell, 454 F. App'x at 40. In Brown, an officer warned Brown numerous times not to attempt to drive away and only pulled Brown out of the vehicle after he told the officer "I don't have to do anything you say" and reached for the gear shift, putting the officer in harm's way. See Brown, 2011 WL 1085892, at *4. Here, by contrast, there is no evidence Hughes was suspected of committing a serious crime, attempted to drive away, or posed an imminent danger to Officers Herbster and Roberts. Accordingly, these cases do not foreclose Hughes's claims. A reasonable juror could find that Officer Herbster's actions amounted to excessive force in violation of Hughes's Fourth Amendment rights.

Finally, Officer Herbster's argument that Hughes is barred by the doctrine set forth in Heck v. Humphrey, 512 U.S. 477 (1994), from raising her claim because

she pled guilty to disorderly conduct is unavailing.  Our court of appeals has
"interpreted <u>Heck</u> as, essentially, inapplicable in most [Section] 1983 actions
asserting Fourth Amendment claims."  <u>See</u> <u>Madero v. Luffey</u>, 549 F. Supp. 3d 435,
444 (W.D. Pa. 2021) (citing <u>Sanders v. Downs</u>, 420 F. App'x 175, 179 (3d Cir. 2011);
<u>see also</u> <u>Clouser v. Johnson</u>, 40 F. Supp. 3d 425, 434 (M.D. Pa. 2014) (Conner, C.J.).
<u>Heck</u>'s applicability to Fourth Amendment claims "requires a case-by-case fact-
based inquiry into whether the claim implies the invalidity of the underlying
conviction or sentence."  <u>See</u> <u>Mills v. Pivot Occupational Health</u>, No. 22-1817, 2022
WL 17984476, at *1 (3d Cir. Dec. 29, 2022) (*per curiam*) (citing <u>Gibson</u>
<u>v. Superintendent</u>, 411 F.3d 427, 447-49 (3d Cir. 2005), <u>overruled on other grounds</u>
<u>by</u> <u>Dique v. N.J. State Police</u>, 603 F.3d 181, 182 (3d Cir. 2010)).  In making that
determination, we are guided by the principle that an actor is liable for any use of
force beyond that necessary to effectuate an arrest or maintain custody.  <u>See</u> <u>Nelson</u>
<u>v. Jashurek</u>, 109 F.3d 142, 146 (3d Cir. 1997) (citing RESTATEMENT (SECOND) OF
TORTS § 133 (1965)).

Viewing the record before us in a light most favorable to Hughes, defendants
have not conclusively demonstrated that a finding in Hughes's favor necessarily
implies the invalidity of her conviction for disorderly conduct.  It is not clear
whether Hughes' disorderly conduct charge stemmed from her refusal to end her
phone call and exit the car, her efforts to remain inside the vehicle when defendants
tried to remove her from it, or her resistance to being handcuffed after being
pinned down.  Lacking a more developed argument as to why a ruling in Hughes's
favor necessarily invalidates her disorderly conduct charge, or a more specific

account of the conduct underlying that charge, the court will not invent one.  In any event, a reasonable juror could find that Officer Herbster's efforts to corral Hughes exceeded what was necessary to maintain or restore order.  Accordingly, it would be inappropriate to grant summary judgment based on <u>Heck</u>.  <u>Cf.</u> <u>DeSabetino v. Biagini</u>, No. 2:16-CV-341, 2020 WL 3469757, at *4 (W.D. Pa. June 24, 2020) (citing <u>Weber v. Rodriguez</u>, No. 07-2097, 2011 WL 2555358 (D.N.J. June 27, 2011)).  We will deny defendants' motion with respect to Hughes's claim of excessive force.

### B.      Failure to Intervene

The Third Circuit has recognized that police officers are directly liable under Section 1983 if they "fail[] or refuse[] to intervene when a constitutional violation . . . takes place in [their] presence."  <u>See</u> <u>Smith v. Mensinger</u>, 293 F.3d 641, 650 (3d Cir. 2002) (quoting <u>Byrd v. Clark</u>, 783 F.2d 1002, 1007 (11th Cir. 1986)).  Yet liability only obtains if the officer has "a realistic and reasonable opportunity to intervene."  <u>Id.</u> at 651 (citations omitted).  Hughes argues Officer Roberts witnessed Officer Herbster's use of unlawful force and did nothing despite having the time and opportunity to intervene.  (See Doc. 99 at 20).  Officer Roberts counters that her liability is contingent upon Officer Herbster's force amounting to a constitutional violation and her understanding that the force was excessive.  (See Doc. 95 at 20).

Officer Herbster has not carried his burden of demonstrating that his use of force did not amount to a constitutional violation, <u>see</u> Part III.A, and whether Officer Roberts had a "realistic and reasonable" opportunity to intervene depends in part upon disputed characterizations of the events in question.  Defendants suggest the events "unfolded rapidly," while Hughes rejoins "there were no split-

13

second decisions being made." (<u>Compare</u> Doc. 95 at 19 <u>with</u> Doc. 99 at 18).  A reasonable juror could draw either conclusion from the video evidence.  The physical portions of the interaction—Officer Herbster extracting Hughes from the vehicle, scuffling with her across the pavement, and ostensibly applying some of his weight to subdue her—present temporally distinct starting points for analyzing whether Officer Roberts had a realistic and reasonable opportunity to intervene.  Thus, Officer Roberts has not satisfied her burden at this stage, and we will deny summary judgment with respect to plaintiffs' failure to intervene claim.

### C.    State-Created Danger

State actors contravene the Due Process Clause of the Fourteenth Amendment when they affirmatively exercise authority in a way that injures someone or leaves them more vulnerable to injury at the hands of a third party.  <u>See</u> <u>Bright v. Westmoreland County</u>, 443 F.3d 276, 281 (3d Cir. 2006) (citing <u>Schieber</u> <u>v. City of Philadelphia</u>, 320 F.3d 409, 416 (3d Cir. 2003)); <u>see generally</u> <u>DeShaney</u> <u>v. Winnebago Cnty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 194-202 (1989).  Courts commonly refer to this basis of liability as the "state-created danger doctrine."  <u>See</u> <u>Bright</u>, 443 F.3d at 281; <u>see also</u> <u>Ye v. United States</u>, 484 F.3d 634, 637-38 (3d Cir. 2007).  To establish a state-created danger claim, plaintiffs must prove four elements:

> (1) [T]he harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.

Phillips v. Allegheny County, 515 F.3d 224, 235 (3d Cir. 2008) (citing Bright, 443 F.3d at 281); see Sanford v. Stiles, 456 F.3d 298, 304-05 (3d Cir. 2006) (*per curiam*).

Hughes argues defendants created a dangerous situation for G.B. in failing to account for or supervise her when she exited the car. Defendants counter that G.B. suffered no apparent harm from the incident, as evidenced by Hughes's failure to seek psychological or medical treatment for her. (See Doc. 95 at 22). They emphasize that G.B. was never out of their sight and that she was only briefly in the street. (See id.) Moreover, G.B. was in the care of a bystander who did not harm or pose a discernable risk to her. (See id.) Accordingly, defendants contend they are entitled to qualified immunity with respect to the state-created danger claim.

No reasonable jury could find defendants put G.B. in harm's way, or caused her any harm, on this record. We agree with defendants that G.B.'s purported harm is limited to being upset about the situation. (See Doc. 95 at 25). Construing the facts in the light most favorable to G.B., the lack of an identifiable injury to her dooms this claim as a matter of law. Courts have recognized state-created dangers when police abandon children in harmful and hazardous situations after arresting their custodians. See, e.g., White v. Rochford, 592 F.2d 381 (7th Cir. 1979) (reversing dismissal of state-created danger claim where police left children on side of freeway in cold weather, resulting in mental anguish and hospitalization). The record before us demonstrates no such harm and no such hazards. Rather, it shows G.B. remained safely within eyeshot, albeit in the arms of a stranger, until Hughes's sister retrieved her from the scene. (See Hughes Dep. at 92:5-25, 139:15-19). We will grant summary judgment to defendants on plaintiffs' state-created danger claim.

### D.      Intentional Infliction of Emotional Distress ("IIED")

Hughes and G.B. each assert claims for intentional infliction of emotional distress.  An IIED claim requires proof that: (1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress and or with knowledge that the same was "substantially certain" to occur.  Brown v. Muhlenberg Twp., 269 F.3d 205, 217-18 (3d Cir. 2001) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d).[5]  Additionally, "a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct."  Reedy v. Evanson, 615 F.3d 197, 231 (3d Cir. 2010) (quoting Swisher v. Pitz, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)).  Whether conduct could reasonably be regarded as extreme and outrageous is a threshold inquiry for the court's determination.  M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist., 43 F. Supp. 3d 412, 430 (M.D. Pa. 2014) (citing Reimer v. Tien, 514 A.2d 566, 569 (Pa. Super. Ct. 1986)).  The Supreme Court of Pennsylvania has cited approvingly the Superior Court's requirement that "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998)

---

[5] The Pennsylvania Supreme Court has not yet explicitly recognized the tort of intentional infliction of emotional distress.  See Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000).  The Third Circuit has predicted that the Commonwealth's high court ultimately will adopt the Restatement (Second) of Torts' formulation.  Williams v. Guzzardi, 875 F.2d 46, 50-51 (3d Cir. 1989); see also Mills v. City of Harrisburg, 589 F.Supp.2d 544, 558 n.13 (M.D. Pa. 2008) (citing Taylor, 754 A.2d at 652).

(alteration in original) (quoting <u>Buczek v. First Nat'l Bank of Mifflintown</u>, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).  We address each plaintiff's claim separately.

      1.    ***Hughes***

Defendants argue Hughes's IIED claim fails because the force used to subdue her was reasonable.  (<u>See</u> Doc. 95 at 28).  They also challenge her right to relief to the extent her claim is based upon G.B.'s flight from the vehicle.  (<u>See</u> <u>id.</u>)  With respect to the former argument, courts have found a police officer's use of excessive force may constitute extreme and outrageous conduct.  <u>See, e.g.</u>, <u>Gill v. United States</u>, 588 F. Supp. 3d 134, 139 (D. Mass. 2022).  Hughes contends Officer Herbster pulled her out of her vehicle without warning, grabbed her by the neck, slammed her into the pavement, and knelt on her back.  (<u>See</u> Hughes Dep. at 61:14-17, 113:17-21).  She also claims to have suffered cuts to her knees and lingering aches and pains throughout her body, including her wrists and neck, (<u>see</u> <u>id.</u> at 69:11-14, 83:7-84:9, 133:20-134:7), thus satisfying the physical-harm requirement, <u>see</u> <u>Reedy</u>, 615 F.3d at 231 (quoting <u>Swisher</u>, 868 A.2d at 1230).  We cannot conclude as a matter of law that the force Officer Herbster used was reasonable and lawful on the record before us, <u>see</u> Part III.A *supra*, therefore it would be premature to dismiss Hughes's IIED claim on that basis.

Hughes identifies two other bases in support of her IIED claim: the panic she felt at being pulled from her car while her daughter was in distress and the fear she experienced when G.B. was left unsupervised in the street.  (<u>See</u> Doc. 99 at 28-29).  Hughes presents no evidence that she suffered any adverse physical effects from those distinct, emotional events, <u>Reedy</u>, 615 F.3d at 231 (quoting <u>Swisher</u>, 868 A.2d

at 1230), thus we will grant defendants' motion and dismiss Hughes's IIED claim insofar as it relates to her panic and fear *vis-à-vis* G.B., as opposed to Officer Herbster's purported use of excessive force.

### 2.   *G.B.*

Defendants suggest the fact G.B. suffered no injuries is fatal to her IIED claim.  (See Doc. 95 at 29).  We agree.  Hughes concedes she did not have G.B. evaluated immediately following the incident or in the ensuing years, (see Hughes Dep. at 118:7-121:4), and there is no evidence in the record from which we may infer she suffered physical harm, which is a prerequisite for recovery under Pennsylvania law, see Geness v. Cox, 902 F.3d 344, 353 n.3 (3d Cir. 2018) (citing Reedy, 615 F.3d at 231-32).  Consequently, defendants are entitled to summary judgment on this claim.

### E.   **Punitive Damages**

Punitive damages are available against individual defendants in a Section 1983 case when there is evidence that the defendants' conduct was "motivated by evil motive or intent" or when the defendants acted with "reckless or callous indifference" to a person's federally protected rights.  Alexander v. Riga, 208 F.3d 419, 430-31 (3d Cir. 2000) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  Punitive damages are also available under Pennsylvania law when a defendant acts with "evil motive or reckless indifference to the rights of others."  See Hutchison *ex rel.* Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) (quoting Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984)).  The actor's state of mind "is vital," and their conduct must be "intentional, reckless, or malicious."  See id. (quoting Feld, 485 A.2d at 748).

Defendants cursorily argue Hughes's request for punitive damages "lacks any support" because their conduct was neither unreasonable nor outrageous.  (See Doc. 95 at 29-30).  Again, we cannot resolve the constitutionality of Officer Herbster's use of force—which necessarily includes consideration of his state of mind—on the current record.   Plaintiffs' punitive damages claim remains viable.

**IV.**   **Conclusion**

We will grant in part and deny in part defendants' motion for summary judgment.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    November 3, 2023